TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
WILLIAM M. ROLLINS (Cal. Bar No. 287007)
Assistant United States Attorney
Terrorism and Export Crimes Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-7407/2426
    Facsimile:  (213) 894-0142
    E-mail:  william.rollins@usdoj.gov
          daniel.boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>SEYED ZIAEDDIN TAHERI ZANGAKANI,<br>SAEED TORAB ABTAHI; ABBAS AMIN;<br>ISSA SHAYEGH; MOJTABA DEHGHANI;<br>SARA SABRI; REZA KARIMI; SHANTIA<br>CHUPRA; SALIM HENAREH; AND<br>KHALIL HENAREH;<br><br>      Defendants. | NO.  2:21-cv-2438<br><br><u>CIVIL COMPLAINT</u><br><br>18 U.S.C. § 1956(b)(1)<br><br>[F.B.I.] |

    The United States of America brings this claim against the

defendants described more particularly below, and alleges as follows:

## NATURE OF ACTION AND PARTIES

1.   This is an action seeking a money laundering monetary penalty pursuant to 18 U.S.C. § 1956(b)(1).

2.   The plaintiff is the United States of America ("plaintiff" or the "government").

3.   The defendants are:

       a.   SEYED ZIAEDDIN TAHERI ZANGAKANI("ZANGAKANI")

       b.   SAEED TORAB ABTAHI ("ABTAHI")

       c.   ABBAS AMIN ("AMIN")

       d.   ISSA SHAYEGH ("SHAYEGH")

       e.   MOJTABA DEHGHANI ("DEHGHANI")

       f.   SARA SABRI ("SABRI")

       g.   REZA KARIMI ("KARIMI")

       h.   SHANTIA CHUPRA ("CHUPRA")

       i.   SALIM HENAREH ("HENAREH"), and

       j.   KHALIL HENAREH ("KHALIL")

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1345, and 1355.

5.   Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## STATUTORY BACKGROUND

6.   The International Emergency Economic Powers Act ("IEEPA") authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats.  50 U.S.C. § 1701(a).  Since 1979, and through the

present day, U.S. presidents have repeatedly declared that the actions and policies of the Government of Iran ("GOI") pose a threat to the United States' national security including, among other actions, the GOI's pursuit of nuclear weapons and its sponsorship of terrorism.

7.  Section 1705 of the IEEPA defines the scope of unlawful activity under the statute: "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).  It also provides a criminal penalty for anyone who, among other things, willfully conspires to commit any of the unlawful acts described in Section 1705(a).  See id. § 1705(c).

8.  Since 1979, the United States has adopted a series of statutes, executive orders, and regulations designed to check the national security threat posed by the GOI's policies and actions, including the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, and the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R. Part 561.  The ITSR target, among other things, exports from the United States or by U.S. persons for the benefit of Iran.

9.  Section 560.204 of the ITSR prohibits, among other things, "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." § 560.204.  Similarly, the ITSR prohibits the reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology,

1  or services that have been exported from the United States if

2  undertaken with knowledge that the reexportation is intended

3  specifically for Iran or the Government of Iran.  See § 560.205.  The

4  ITSR provides that the transfer of funds, directly or indirectly,

5  from the United States by a U.S. person to Iran or the Government of

6  Iran is a prohibited export, re-export, sale, or supply of services

7  to Iran or the Government of Iran.  See § 560.427(a).

8      10.  In addition, section 560.203 of the ITSR states that "any

9  transaction on or after the effective date [meaning 1979] that evades

10 or avoids, has the purpose of evading or avoiding, causes a violation

11 of, or attempts to violate any of the prohibitions set forth in this

12 part is prohibited," and that "[a]ny conspiracy formed to violate any

13 of the prohibitions set forth in this part is prohibited."

14     11.  The IFSR, which were enacted in part under the authority of

15 IEEPA, implement, among other things, a series of legislative and

16 executive steps taken to attempt to restrict the Government of Iran,

17 its Islamic Revolutionary Guard Corps', or any of its agents or

18 affiliates access to U.S. currency, including (i) the National

19 Defense Authorization Act for Fiscal Year 2012 (the "NDAA"), which

20 allowed for sanctions to be imposed on foreign financial institutions

21 that were determined by the Secretary of Treasury to knowingly have

22 conducted or facilitated significant financial transactions with the

23 Central Bank of Iran or a designated Iranian financial institution,

24 and (ii) the subsequently enacted Iranian Threat Reduction and Syria

25 Human Rights Act of 2012 ("ITRA"), which further restricted Iran's

26 access to its oil proceeds, for example, by directing that sanctions

27 should be imposed on foreign financial institutions that did not

28 restrict the use of Iranian oil proceeds to fund bi-lateral trade

(<u>i.e.</u>, trade between the institution's host country and Iran).  <u>See</u> 31 C.F.R. Part 561.

12.  Any conspiracy formed to violate the IFSR is prohibited by 31 C.F.R. § 561.701(b).

<u>**FACTUAL ALLEGATIONS**</u>

**A.   Background on Iranian Sanctions Avoidance**

13.  Iran uses front and shell companies[1] to exploit financial systems around the world to generate revenue and transfer funds in support of terrorist groups, ballistic missile development, human rights abuses, support for the Syrian regime, and other destabilizing actions targeted by U.S. sanctions.

14.  Iran uses exchange houses and trading companies in other countries to act as money transmitters to process funds transfers through the United States which are not authorized by the U.S. Office of Foreign Assets Control ("OFAC").[2]

15.  Iranian actors use front and shell companies around the world to procure technology and services in order to evade sanctions, thereby obtaining goods and services related to currency counterfeiting, dual-use equipment (meaning equipment having both civilian and military applications), and the commercial aviation industry.  Iran-related actors have attempted to purchase printing machinery and raw materials to print counterfeit bank notes in support of the Islamic Revolutionary Guards Corps' Quds Force ("IRGC-

---

[1] "Front" or "shell" companies are commonly used to inhibit the identification of controlling owners and/or members of another company or organization, often for the purpose of frustrating law enforcement's investigation of illicit transactions.

[2] OFAC is a U.S. government agency component of the United States Treasury Department that administers and enforces economic and trade sanctions in support of U.S. national security and foreign policy.

QF"), an extraterritorial paramilitary force.  Iran-related actors frequently use intermediary companies to obfuscate both the true purchaser and the final recipient of goods and services.

    **B.  Background on the Defendants' Control of, and Association with, Currency Exchange Businesses in Canada and the U.A.E.**

    16.  ZANGAKANI, ABTAHI, SHAYEGH, HENAREH, and KHALIL have each owned or been employed by companies in Canada and/or the U.A.E. that are associated with money services businesses in Iran:

    a.  Rosco Trading LLC ("ROSCO TRADING") is a company based in the U.A.E. that purports to assist Canadian suppliers with the purchase of products, raw materials, heavy industrial equipment, and special machinery.  ZANGAKANI owns 5% of ROSCO TRADING.

    b.  Rosco Trading International Ltd. ("ROSCO INTL") is a currency exchange business located in Toronto, Canada, which provides exchange services for at least 40 international currencies.

    c.  ROSCO INTL is co-located with and does business as Persepolis International Ltd. ("PERSEPOLIS"), a registered Money Services Business ("MSB") in Canada.

    d.  HENAREH owns 44% of ROSCO TRADING, and is the principal and president of ROSCO INTL. HENAREH is also the president of PERSEPOLIS.

    e.  KHALIL serves as a compliance and operations employee for ROSCO INTL. KHALIL was the Information Technology and Operations Manager for PERSEPOLIS, and KHALIL also registered and operated web domains for PERSEPOLIS, among other companies.

    f.  ABTAHI is a national of Canada and Iran and serves as the Vice President of ROSCO INTL.  In August of 2018, ROSCO INTL announced on its webpage that, due to "added sanctions pressures,"

ROSCO INTL would not accept any money transfer requests to or from Iran "until further notice."

g.   SHAYEGH is a citizen of Iran and is a foreign currency "specialist" for PERSEPOLIS.

h.   ROSCO TRADING shares a physical address with Rosco Investment International LLC ("ROSCO INVESTMENT") in the U.A.E. Collectively, ROSCO TRADING, ROSCO INTL, PERSEPOLIS, and ROSCO INVESTMENT, are hereinafter referred to as the "ROSCO ENTITIES."

i.   Although ROSCO INVESTMENT's website – "roscoinvestment.com" – is no longer active, KHALIL was the registrant contact, technical contact, administrative contact, and billing contact for the ROSCO INVESTMENT domain name.

j.   KARIMI is an employee of a money exchange in the U.A.E. and provided advice to ZANGAKANI and the ROSCO ENTITIES regarding how to evade sanctions on Iran.

**C.   The ROSCO ENTITIES' Association with ROSCO EX in Iran**

17.   KHALIL registered a website for an Iranian currency exchange business, Rosco Exchange ("ROSCO EX"), which publicly displays and advertises the "Rosco," "Persepolis," and "Henareh" names.

18.   ROSCO EX is located in Tehran, Iran.

19.   KHALIL is the "listed registrant" of the ROSCO EX website "sarafipersepolis.ir."[3]  The domain holder for the ROSCO EX website is the "Payam Avarane Khorshid Company" located in Shiraz, Iran.  The company's online profile publicly references ROSCO EXCHANGE, PERSEPOLIS, and HENAREH.

---

[3] The internet country extension for Iranian websites is ".ir".

7

20.   The ROSCO EX domain subscriber contact information shares a telephone number and address with ROSCO INTL and PERSEPOLIS in Canada.

**D.   Background on Additional Coconspirators and Petrochemical Companies in Iran**

21.   AMIN is a citizen of Iran and the Credit Finance Manager for Iran-based Supplying Petrochemical Industries Part Equipment and Chemical Engineering Company ("SPEC").

22.   SABRI is a "Commercial Expert" for Compressor Tech Trading ("COMPRESSOR TECH"), a company purportedly based in the U.A.E. but that actually operates in Iran, as detailed further below.

23.   DEHGHANI is a citizen of Iran and an employee within the financial department of Iran-based Fateh Sanat Kimia ("FATEH SANAT").

**E.   ZANGAKANI, HENAREH, and SHAYEGH were Linked to a California Business that Illegally Transferred Money to Iran in 2003**

24.   Beginning in 1999, HENAREH served as President of Persepolis Financial Services, Inc. ("PERSEPOLIS FINANCIAL"), a corporation based in Encino, California and incorporated on August 6, 1999.  In 2003, SHAYEGH, the vice president of PERSEPOLIS FINANCIAL, was convicted in Los Angeles County Superior Court of violating Section 1823 of the California Financial Code for transmitting money to Iran.

25.   The year before SHAYEGH's conviction, a California state law enforcement undercover officer ("UC") contacted PERSEPOLIS FINANCIAL at its publicly listed telephone number in Encino.  The UC spoke with ZANGAKANI.

26.   During the call, ZANGAKANI told the UC how to surreptitiously send money from the United States to Iran and provided the UC with an Iranian currency to U.S. dollar exchange

8

rate.  ZANGAKANI also directed the UC to PERSEPOLIS FINANCIAL in Encino, where the UC ultimately met SHAYEGH in-person.

### F.   Defendants Were Aware of And Discussed Iranian Sanctions and How to Facilitate Sanctions Violations after SHAYEGH's 2003 Conviction

27.  Defendants continued to discuss and arrange U.S. dollar transactions on behalf of Iran after SHAYEGH's 2003 criminal conviction.

28.  On January 17, 2012, ZANGAKANI and SHAYEGH communicated about "American Hawalas/ Transactions" from an employee of ROSCO INTL.  The email indicated that ZANGAKANI would be "introduced" to "American customers" and provided instructions on how to calculate the Toman rate, a superunit of the official currency of Iran, the Rial, and how to add a Toman fee for American transactions.[4]

29.  On August 8, 2012, ZANGAKANI emailed SHAYEGH a copy of an invoice for a U.S.-dollar payment made on behalf of an Iranian company for gas and oil:

a.   In particular, ZANGAKANI forwarded a request from a U.A.E. trading company[5] for an "invoice" on "letterhead" that would enable the trading company "to arrange [for] the transfer of funds directly to your account."

b.   The email included a commercial invoice from OIL COMPANY 1, an Iranian oil and gas company, in the amount of $343,516.46 of "Gas Oil – Type – A" and "Gas Oil – Type – B" for a shipment from Erbil, Iraq to Heraat, Afghanistan.

---

[4] One toman is equivalent to ten rials, which are the official currency of Iran.

[5] U.A.E. trading companies are often used by individuals and entities acting on behalf of Iran to send and receive U.S. dollar payments because U.S. dollars cannot be wired directly to Iran as a result of economic sanctions.

30.  On May 14, 2014, ZANGAKANI sent SHAYEGH business cards (in Farsi and in English) identifying SHAYEGH as the "International Specialist of the Foreign Currency" for PERSEPOLIS.  In addition to offices in Toronto and Dubai, SHAYEGH's business cards stated that PERSEPOLIS has an office in Tehran, Iran.[6]

31.  On June 18, 2012, KARIMI and ZANGAKANI discussed how to surreptitiously transfer funds from Iran to accounts in Canada and evade economic sanctions, including under IEEPA and ITSR.  In those communications, KARIMI identified two important factors that would help disguise any transfer:

a.  According to KARIMI, if the transfer was initiated from a suspicious sender and the amount exceeded $40,000, the bank would block the transaction and investigate the sender and the receiver.  KARIMI advised ZANGAKANI to keep the amount below the $40,000 threshold and to use a reliable sender.

b.  KARIMI also provided ZANGAKANI with instructions on how to describe the senders and beneficiaries in fund transfers.  If the person sending the money did so on behalf of a currency exchange entity, KARIMI recommended that ZANGAKANI describe the person as the "father" of the account holder.  Moreover, KARIMI advised ZANGAKANI to state that the funds were transferred from any country other than Iran because sanctions would create problems if the transfers declared that the funds were provided from Iran.

---

[6] In 2014, ZANGAKANI and SHAYEGH also exchanged an email about a U.S. dollar transfer into the Central District of California.  On March 10, 2014, ZANGAKANI emailed SHAYEGH a Western Union receipt for a $5,000 transfer from an individual in the U.A.E. to a person in Los Angeles.

1    32.   On December 12, 2012, ABTAHI sent ZANGAKANI an email
2  attaching an OFAC publication that provided an overview of OFAC
3  regulations involving sanctions against Iran. The document was
4  titled, "What You Need To Know About U.S. Economic Sanctions."

5         a.   In the email, ABTAHI directed ZANGAKANI to the top of
6  page 4 of the attachment, which displayed a list of several Iranian
7  companies determined to be the Government of Iran, as defined in 31
8  C.F.R. § 560.304.

9         b.   The list of companies included NPC INTERNATIONAL
10  LIMITED ("NPC") and the PETROCHEMICAL COMMERCIAL COMPANY ("PCC"),
11  including its affiliates; NPC and PCC are both energy companies based
12  in Iran.  Additionally, the top of page 4 included a paragraph
13  detailing 31 C.F.R. Part 535, the Iranian Assets Control Regulations.

14    33.   ZANGAKANI forwarded ABTAHI's December 12, 2012 email to
15  AMIN who, as noted above, is an employee of the Iranian petrochemical
16  company SPEC.[7]

17    34.   On June 4, 2013, ABTAHI emailed ZANGAKANI a U.S. Department
18  of the Treasury website link and stated in Farsi, "look at this
19  chart.  It's new."  The link provided a U.S. Treasury PDF document
20  titled, "The Execution of Imam Khomeini's Order ("EIKO"),
21  International Financial Network," which was described as a major
22  network of front companies controlled by Iranian government
23  leadership and tasked with evading U.S. sanctions.  According to the
24  PDF, the stated purpose of the network is to generate and control
25  massive, off-the-books investments, shielded from the view of the
26  Iranian people and international regulators.

27

28         [7] SPEC is a "subsidiary" of Iran's PCC, and ROSCO INVESTMENT
performs financial services on behalf of SPEC.

35.  On July 19, 2016, ABTAHI sent ZANGAKANI an email with an attachment and stated, "Please see after page 35.  This became effective after June 16, 2010."  The attachment was OFAC's Specially Designated Nationals and Blocked Persons List ("SDN") list.  Page 35 of the document was the start of Iranian companies added to the OFAC SDN list on June 16, 2010.  The heading for the list was highlighted in yellow.  Beginning on page 37, multiple Iran-based companies were highlighted, including the NATIONAL IRANIAN OIL COMPANY ("NIOC") and PCC.

36.  On July 19, 2016, ZANGAKANI forwarded a U.S. Department of Treasury link for OFAC enforcement regarding NPC and PCC to AMIN at SPEC.

**G.   Defendants Transferred Millions of U.S. Dollars to Malaysia on Behalf of Iranian Oil Companies**

37.  Between April and August of 2012, ZANGAKANI and AMIN used ROSCO TRADING to send eleven wire transfers totaling approximately $20 million to International Oil Design and Construction ("IODC") in Malaysia.[8]  The correspondent bank that processed the U.S. dollar transaction was Standard Chartered Bank in New York.

38.  These U.S. dollar transfers were executed on behalf of two Iranian oil companies:  SPEC, where AMIN served as the credit manager, and Oil Industries Engineering & Constructions ("OIEC"), which is based in Tehran, Iran.

a.  On April 23, 2012, AMIN emailed ZANGAKANI about "payment splits for IODC."  AMIN stated, "Pls find attached the invoice for transfer of USD 2 mln."  The email included an attachment

---

[8] Online news publications describe IODC as a unit of the Oil Design and Construction Company group of Iran.

12

for an IODC invoice of $2,000,000.  The listed customer/payee was ROSCO TRADING LLC.

      b.   AMIN's email to ZANGAKANI included a forwarded discussion between AMIN and the IODC Managing Director about how best to send funds to IODC:

      i.   In the forwarded message, AMIN told IODC's managing director that "[we've] received orders to transfer some funds to yr good company, we would like to know how to split the amount (max. payable for each payment) in order to not create any possible problems for you."

      ii.   IODC's managing director responded, "[w]e can receive any amount only if it is justified by an invoice. Please be kind enough to send us the exact amount and the name of the transferring company so that we then issue invoices to that company. I suggest to send the funds in different amounts between 2 million and 10 million."

      iii. On April 24, 2012, ROSCO TRADING LLC sent $2,000,000 to IODC via wire transfer.[9]

      c.   On November 1, 2012, ZANGAKANI received an email attaching a spreadsheet with a tab titled, "Rosco Investment International LLC, Statement of Account."  The spreadsheet described multiple apparent wire transfers, including a wire sent on April 24, 2012, to "IDOC [sic] SDN BHD."[10]  According to the spreadsheet, the

---

    [9] On information and belief, all U.S. dollar-denominated transfers described herein occurred from within the United States to places outside the United States, or through the use of U.S. dollar-denominated correspondent banking accounts.

    [10] "Berhad" is a suffix used in Malaysia to identify a public limited company.  The suffix "Sendirian Berhad (SDN BHD)" identifies a private limited company.

original April 24, 2012 wire transfer amount was listed as 7,397,600 U.A.E. Dirhams ("AED"), which equated to $2 million United States Dollars ("USD").  The transfer included a .90% transfer fee.

d.    Between April 24, 2012 and August 2, 2012, IODC received a total of 11 wire transfers from ROSCO TRADING LLC which aggregated to $20,089,750.

e.    In addition, ROSCO TRADING sent $6,000,000 to IODC on behalf of two Iranian oil companies:  SPEC and OIEC.

i.    In particular, on October 11, 2012, AMIN sent an email to ZANGAKANI titled "Fw: Service Invoice - SPEC."  AMIN stated, "Pls find attached the required invoices."

ii.    The email attached four IODC commercial invoices for "piping material" in the amount of $6,000,000.  The listed "customer" was OIEC with an address in Tehran, Iran.
In another email forwarded to ZANGAKANI later that same day, AMIN asked the managing director of IODC in Malaysia to issue the invoice to a different entity instead of the "existing" company.

f.    In his email, AMIN attached new signed invoices for the $6,000,000 purchase matching the prior invoices except for the customer.  The new invoices removed OIEC, its address in Tehran, and deleted any mention of ROSCO TRADING LLC in the description block, replacing the "customer" with a different entity, HAMILTON FAHO TRADING ("HAMILTON FAHO"), purportedly located outside of Iran.

g.    HAMILTON FAHO is located in the U.A.E.  In July of 2012, a Mashreq Bank employee sent ZANGAKANI a letter describing ZANGAKANI as HAMILTON FAHO's "authorized representative."

39.  HAMILTON FAHO sent approximately $10,000,000 USD between October 11, 2012 and December 10, 2012 to IODC (including a total of

$6,000,000 between December 5 and December 10, 2012).  The transactions were sent from HAMILTON FAHO's Emirates NBD account in the U.A.E. to IODC's account in Malaysia.  The correspondent U.S. dollar transaction was processed by Standard Chartered Bank in New York.

### H.   The ROSCO ENTITIES Send Over $300 Million from the U.A.E. to Exchange Houses and MSBs in the West

40.  Between August 2011 and January 2014, defendants used ROSCO TRADING to send at least 696 wire transfers totaling over $208 million to different exchange houses and MSB services around the world.

41.  Of the $208 million in wire transfers, $59,930,712 was sent between two of the ROSCO ENTITIES -- in particular, from ROSCO TRADING in the U.A.E. to ROSCO INTL in Canada.  Moreover, despite descriptions of ROSCO TRADING on U.A.E.-based websites as specializing in "engines" and "industrial plant equipment and spare parts," ROSCO TRADING identified the purpose of almost all of the wire transfers during this period as "invest[ing] in [the] financial market."

42.  Defendants, using the ROSCO ENTITIES, also sent millions of dollars into the United States.  Between November 2011 and April 2014, for example, ROSCO INTL sent 69 wire transfers totaling $1,664,062 to individuals, telecommunication companies, private businesses, and an exchange house in the United States.  Similarly, between January 2012 and continuing through August 2013, ROSCO TRADING wired $4.3 million into the United States; ROSCO TRADING sent funds to many of the same entities that received money from ROSCO INTL, as well as EXCHANGE HOUSE 1, a money services business based in

Woodland Hills, and an escrow company based in Beverly Hills, within the Central District of California.

43.   In order to circumvent U.S. sanctions, Iranian-based government agencies, businesses, and individuals frequently transfer funds surreptitiously from Iran to the U.A.E. before sending money to third-party exchange houses and MSBs in countries such as Canada, Australia, Great Britain, New Zealand, and the United States.

44.   On information and belief, the ROSCO ENTITIES were shell entities used solely for the purposes of facilitating IEEPA- and ITSR-violative transactions. As described herein, the transfer of substantial assets between two of the ROSCO ENTITIES, as well as the ROSCO ENTITIES' surreptitious U.S. dollar transfers to other countries on behalf of Iranian oil companies, is consistent with patterns of Iranian sanctions avoidance and money laundering in furtherance of the same.

**I.    Defendants Used a Front Company to Secretly Buy Two Oil Tankers on Behalf of Iran in 2012**

45.   On March 14, 2013, the United States imposed sanctions on a Greek businessman ("BUSINESSPERSON A").  According to the Treasury publication, BUSINESSPERSON A repeatedly helped Iran evade U.S. sanctions by laundering Iranian funds to purchase multiple oil tankers and disguising the Iranian origin of oil transported on the vessels.

46.   Specifically, BUSINESSPERSON A served as president of SHIPPING COMPANY 1 and used his shipping company, as well as several front companies, to purchase oil tankers while disguising the fact that the tankers were being purchased on behalf of the National Iranian Tanker Company ("NITC").  BUSINESSPERSON A's front companies

obscured the fact that the vessels, which are capable of carrying roughly $200 million of oil per shipment, are the property of the Iranian government.  Another front company, SHIPPING COMPANY 2, operated the vessels that BUSINESSPERSON A and SHIPPING COMPANY 1 purchased on behalf of NITC with the aim of loading them with Iranian oil supplied by the National Iranian Oil Company ("NIOC").

47.  Two of the oil tankers acquired by BUSINESSPERSON A on behalf of NITC were the "OCEAN PERFORMER" and the "ZAP," both of which were Liberian-flagged ships.  The OCEAN PERFORMER's International Maritime Organization ("IMO") number - a unique identifier for ships, registered ship owners, and management companies - was 9013749.  The ZAP's IMO number was 9005235.[11]

48.  In 2012, certain of the Defendants, including HENAREH, KHALIL, ZANGAKANI, and AMIN, used a front company to acquire these exact same vessels (the OCEAN PERFORMER and the ZAP) from BUSINESSPERSON A on behalf of SPEC in Iran.

49.  Defendants KHALIL and HENAREH executed the acquisition of the OCEAN PERFORMER and the ZAP using a Hong Kong-based front company called TOTAL EXCELLENCE LIMITED ("TOTAL EXCELLENCE").[12]

50.  ZANGAKANI and AMIN also used TOTAL EXCELLENCE and ROSCO INVESTMENT to secretly facilitate the U.S. dollar transactions with BUSINESSPERSON A on behalf of SPEC in Iran.  For example:

---

[11] According to the IMO, ship identification numbers were adopted to enhance maritime safety, pollution prevention, and to facilitate the prevention of maritime fraud.  IMO numbers remain unchanged upon transfer of a ship to other flags and are inserted into the ship's certificates; in other words, the IMO number is never reassigned to another ship and is shown on the ship's certificates.

[12] According to an annual income return document prepared by a Hong-Kong based CPA in 2014, HENAREH served as the "director" of TOTAL EXCELLENCE LIMITED.

a.   On August 13, 2012, BUSINESSPERSON A emailed ZANGAKANI with information regarding a bank account in Athens, Greece capable of accepting U.S. dollar wire transfers.  ZANGAKANI then forwarded this information to AMIN at SPEC.  AMIN responded and stated, "We'll correct our letter to you with USD A/C number."

b.   On August 23, 2012, BUSINESSPERSON A emailed ZANGAKANI and told him that BUSINESSPERSON A's Athens-based bank was cross-checking the source of funds being wired into the account by TOTAL EXCELLENCE LIMITED.

c.   In response, ZANGAKANI wrote to BUSINESSPERSON A with a description of TOTAL EXCELLENCE LIMITED's purported business operations; in particular, ZANGAKANI claimed that TOTAL EXCELLENCE LIMITED was a "global company in the construction machinery industry" that supplied "heavy equipment brands."  ZANGAKANI also claimed that TOTAL EXCELLENCE LIMITED invested in construction and transportation businesses, including a "shipping fund" to acquire an oil tanker.

d.   Over the next several days, ZANGAKANI and BUSINESSPERSON A exchanged emails regarding invoices that ZANGAKANI needed to provide to his "bank of china" for the U.S. dollar wire transfers for the two oil tankers.

e.   On August 28, 2012, BUSINESSPERSON A emailed ZANGAKANI two invoices (on SHIPPING COMPANY 1 letterhead) for the purchase of the following two oil tankers:  (1) the YIOMARAL, with IMO Number 9005235 (the number assigned to the ZAP) and a total purchase price of $26,150,000; and the OLYMPIC LOYALTY, with IMO Number 9013749 (the number assigned to the OCEAN PERFORMER) and a total purchase price of $25,500,000. Plaintiff alleges on information and belief that the names of the ZAP and the OCEAN PERFORMER were changed (to YIOMARAL

and OLYMPIC LOYALTY, respectively) in an attempt to disguise the transfer.  According to the invoices, TOTAL EXCELLENCE would wire an initial payment of $942,200 USD as part of the acquisition of the OLYMPIC LOYALTY, and an initial payment of $1,212,800 USD as part of the acquisition of the YIOMARAL.

   f. On September 7, 2012, ZANGAKANI received an email with a spreadsheet regarding ROSCO INVESTMENT's "statement of account" for SPEC (among other transactions).  The spreadsheet included an August 13, 2012 line item indicating that the SPEC account was debited "2,155,000.00," the exact combined total U.S. dollar value of the initial payments wired to BUSINESSPERSON A for the two oil tankers above.

**J. Defendants Create New Front Companies in the U.A.E. on Behalf of Iran**

51. The defendants, including ZANGAKANI and SABRI, among others, discussed the creation of two additional front companies in the U.A.E. – COMPRESSOR TECH and EXPROM – to conduct additional U.S. dollar transactions on behalf of Iran.

52. Despite being purportedly located in the U.A.E., COMPRESSOR TECH and EXPROM operated in conjunction with the ROSCO ENTITIES and were in fact designed to be used as front companies to disguise transactions on behalf of Iran.  For example:

   a. On June 8, 2014, SABRI, a COMPRESSOR TECH employee emailed ZANGAKANI and asked him to "[r]efer to [the] confirmation of [the] managing director," and to "note" that "we're going to add Rosco's address, tell numbers and fax numbers as below in Compressor tech's letterhead & our electronic signature pls confirm."  SABRI also asked ZANGAKANI to "provide 2 sim cards for us (not credit sim

19

1  cards) with roaming in Iran for unlimited duration as soon as

2  possible; we need sim cards that Etisalat issues bill monthly."[13]

3       b.   Within the email, SABRI indicated that the new address

4  for COMPRESSOR TECH would be the same address used by ROSCO TRADING

5  and ROSCO INVESTMENT in the U.A.E.

6       c.   On June 10, 2014, SABRI emailed ZANGAKANI again and

7  stated, "Further to our conversation as I explained inserting Rosco's

8  address in our letter head is ok and doesn't make problem for no one,

9  even current address on our letter head is related to another co."

10      d.   Two weeks later, on June 24, 2014, SABRI emailed

11 ZANGAKANI again and asked him to "note we announced relocation of

12 Compressor tech trading as following email to all business partners."

13 SABRI asked ZANGAKANI to please "give necessary notice to your

14 operator" when "our partners" call a specific telephone number and

15 "ask[] to talk with someone is compressor tech trading [sic]."

16      e.   SABRI also warned ZANGAKANI not to "release [that]

17 we're not there and we locate in Iran," because "all of suppliers

18 supply sanctioned goods and they don't know anything about Iran at

19 all."

20      f.   SABRI instructed ZANGAKANI to advise the "operator

21 [to] take the messages and then give our cell numbers to them, also

22 from now on our suppliers will send original docs to this mailing

23 address pls introduce someone at your office who'll be in contact

24 with us for these sorts of jobs then I'll explain him/her what to do

25 when receive the docs."  SABRI provided the same address used by the

26

27

---

28     [13] Etisalat is an Emirates Telecommunication Group Company which
operates in 15 countries across Asia, the Middle East, and Africa.

ROSCO ENTITIES in the U.A.E. and that was listed by EXPROM in invoices seized pursuant to the Federal Search Warrants.[14]

       g.   Also on June 24, 2014, ZANGAKANI received an email from an employee of SPEC, the Iranian oil company, telling ZANGAKANI that the name of the "new company" was "Exprom trading FZE."  After ZANGAKANI asked for information regarding the activity of EXPROM, the SPEC employee responded, "General trading, same as compressor tec."

**K.   Defendants Secretly Sell $1,000,000 worth of Iranian Oil Equipment to South Korea in a Transaction Processed by a U.S. Bank**

53.   Starting in 2015, ZANGAKANI, SABRI, and ABTAHI began discussing a plan to sell air fin coolers - which can be used in the petrochemical industry to transfer heat from liquid or gas into ambient air - to a South Korean company ("ENERGY COMPANY 1"), on behalf of the Iranian company Babak Copper Co. ("BABAK COPPER")[15] and FATEH SANAT, the same Iranian petrochemical company mentioned above. The transaction was conducted in U.S. dollars and processed by JP Morgan Chase bank in New York.

54.   After a series of email exchanges among SABRI, ZANGAKANI, EMPLOYEE N, ABTAHI, and ENERGY COMPANY 1 employees regarding which company would be used for the sale, the deal ultimately culminated in March of 2017 when ENERGY COMPANY 1 wired $1,000,000 to a front company selected by the conspirators.  According to invoices, emails,

---

[14] On June 21, 2016, EXPROM sent one wire transfer of approximately $8,892 to a U.S.-based business in La Porte, Texas that specialized in turbine repairs and sales. The items were billed and shipped to COMPRESSOR TECH at a known ROSCO address that SABRI indicated COMPRESSOR TECH would use.  The transaction was processed through Bank of New York Mellon to Trustmark Bank.

[15] According to a website for the Middle East & Mineral Industry Development Holding Company, BABAK COPPER specializes in a wide range of activities to include mineral processing and import and export of goods and equipment, among other activities.

and wire transfer records, the $1,000,000 was used to purchase air fin coolers from Iran-based BABAK COPPER and FATEH SANAT:

a.   In January of 2015, SABRI and ZANGAKANI began discussing via email how to receive a $1,000,000 payment from ENERGY COMPANY 1 (in connection with a project for BABAK COPPER, as discussed further below), and they exchanged a variety of draft "invoices" regarding the payment.  The invoices were changed several times because, according to the emails, various companies that were selected to receive the payment were being phased out of "existence."

b.   In May 2016, for example, after initially selecting a company that was supposed to receive the million-dollar payment from ENERGY COMPANY 1, SABRI asked ZANGAKANI to create a new invoice for the same payment under a different company's letterhead.

c.   ZANGAKANI responded by providing SABRI with an invoice listing ENERGY COMPANY 1 as the "buyer" and a U.A.E. company - Prime Elite FZE ("PRIME ELITE") - as the beneficiary.  But the invoice provided by ZANGAKANI omitted key details about the transaction, such as the dollar amount, the date, and the seller.  The following day, SABRI responded to ZANGAKANI via email by filling in missing details on the invoice to indicate that ENERGY COMPANY 1 would pay PRIME ELITE a total of $1,000,000 USD.

d.   Despite selecting U.A.E.-based PRIME ELITE as the company that would receive the ENERGY COMPANY 1 payment, emails show that the true sellers of the equipment (and beneficiaries of the transaction) were two companies based in Iran:  FATEH SANAT and BABAK COPPER.

i.   For example, in October 2016, an ENERGY COMPANY 1 representative emailed SABRI about "bank information for 'Fateh

Sanat,' CCWS maker of BABAK COPPER project."  The ENERGY COMPANY 1 representative told SABRI that the bank information was incorrect and had been rejected, and asked SABRI to check the bank information for PRIME ELITE again.

        ii.  In response, SABRI wrote that COMPRESSOR TECH had a current outstanding balance of $2,230,000 with ENERGY COMPANY 1. SABRI asked that COMPRESSOR TECH's outstanding balance be reduced by $1,000,000 to cover the payment owed by ENERGY COMPANY 1.

        iii. As an alternative, SABRI wrote that "[w]e have another account in Hong Kong in USD currency, which you can transfer the amount in USD currency," but "under the condition that [you] do not mention any name of Iran or compressor tech trading; otherwise both party will face problem [sic] and we cannot receive the amount."

    e.  SABRI's efforts to deduct the million-dollar payment for FATEH SANAT and BABAK COPPER from COMPRESSOR TECH's account balance were apparently unsuccessful, as the conspirators continued to attempt to find yet another company that could receive the U.S.-dollar denominated funds from ENERGY COMPANY 1:

        i.  On December 10, 2016, SABRI sent EMPLOYEE K, CHUPRA, ZANGAKANI, and EMPLOYEE N an email titled "RE: GLOBAL USD --- CCWS --- Babak Copper Project"  attaching a vendor information account form for ENERGY COMPANY 1 and an invoice regarding the sale of air fin coolers to ENERGY COMPANY 1 for $1,000,000, dated December 7, 2016.  The listed seller was Global Elite Industrial Plant Equipment and Spare Parts Trading LLC ("GLOBAL INDUSTRIAL").[16]

---

[16] GLOBAL INDUSTRIAL is purportedly a U.A.E. business that specializes in construction equipment and machinery, but its website is nearly an exact replica of the website for a Hong Kong company *(footnote cont'd on next page)*

1        ii.  The forwarded discussion indicated that CHUPRA

2 previously provided SABRI with a U.S. dollar account number and that

3 CHUPRA had warned SABRI not to mention Iran when depositing the

4 funds.  CHUPRA also asked SABRI to double check the account number

5 for each transaction to make sure the account would not be blocked.

6        iii. Shortly thereafter, SABRI asked ZANGAKANI and a

7 COMPRESSOR TECH employee to update the Excel file (vendor account

8 form) because the account number in the invoice did not match the

9 account number in the Excel file.

10        f.  Eventually, after the conspirators exchanged a series

11 of emails indicating that PRIME ELITE might assign its interest in

12 the million-dollar payment to GLOBAL INDUSTRIAL, SABRI emailed

13 EMPLOYEE N on February 14, 2017 with an "invoice draft with the total

14 amount of USD 1,000,000" and asked EMPLOYEE N for "related bank

15 account details in USD currency from Prime Elite FZE as soon as

16 possible."  SABRI asked that the invoice be prepared on PRIME ELITE

17 letterhead with a signature and stamp.  EMPLOYEE N replied, "I[']m

18 preparing, I will send now."

19        g.  On March 9, 2017, ENERGY COMPANY 1 sent $1,000,000 USD

20 to "PRIME ELITE FZE FATEH SANAT" at the National Bank of Fujairah in

21 the U.A.E.  The transaction was processed through a U.S.

22 correspondent account held at JP Morgan Chase Bank N.A. in New York.

23 **L.   The Conspirators Used U.S. Dollars to Buy Heavy Machinery from ENERGY COMPANY 1 on Behalf of Iran**

24

25 55.  SABRI, ZANGAKANI, EMPLOYEE N, and CHUPRA agreed to send

26 millions of dollars to ENERGY COMPANY 1, in part to acquire four

27 

28 founded by ZANGAKANI called Globalelite Trading a/k/a Global Elite Inc ("GLOBAL ELITE").

integrally geared compressors – which can be used in the petroleum, chemical, and gas industries – on behalf of Iran-based BABAK COPPER.

56.  On May 9, 2016, ZANGAKANI received two emails from a representative of COMPRESSOR TECH.  The emails requested the payments of $750,000 and $62,743.20 to ENERGY COMPANY 1.

57.  On May 11 and May 12, 2016, EXPROM sent $62,743.20 and $750,000 to ENERGY COMPANY 1.[17]  The emails included attachments of documents on COMPRESSOR TECH letterhead which authorized the payments.  The transactions were conducted through Bank of America as the intermediary bank.

58.  On November 26, 2016, SABRI informed an ENERGY COMPANY 1 representative that a payment of $1,230,000 had been made to ENERGY COMPANY 1.  In the communication, SABRI reiterated and underlined the following: "do not mention Iran name at all" (underline in original). On December 5, 2016, SABRI also informed EMPLOYEE K and CHUPRA of COMPRESSOR TECH's finance department that the payment to ENERGY COMPANY 1 needed to be in U.S. dollars.

59.  Also on December 5, SABRI asked ZANGAKANI to provide an invoice in the amount of $1,000,000 USD with a matching letterhead, as well as an account for the U.S.-dollar transaction.  CHUPRA forwarded the email, which included SABRI's underlined instruction to not mention Iran, to EMPLOYEE N and requested that EMPLOYEE N complete the "attached form" requested by finance.  The attached form was ENERGY COMPANY 1's vendor account information form.  The following day EMPLOYEE N sent CHUPRA the vendor request form with PRIME ELITE FZE's account information included.

---

[17] In May 2016, EXPROM sent approximately $2.4 million USD to ENERGY COMPANY 1.

60.   On December 12, 2016, EMPLOYEE N emailed CHUPRA and stated, "we got a message today [from] the [correspondent] bank that 570,000 USD is on hold and there are some inquiries from the bank they also need an invoice for the related payment."

61.   CHUPRA responded and provided an attachment.  The attachment was a commercial invoice on ENERGY COMPANY 1 letterhead. The invoice indicated COMPRESSOR TECH had initially purchased four two-stage integrally geared compressors from ENERGY COMPANY 1 on December 30, 2014 for $1,465,000 USD for a project titled "BABAK COPPER."  According to the invoice, the third payment[18] of $570,000 USD, 39% of the contract, was due.

**M.   ZANGAKANI Used EXPROM to Wire Funds into the Central District of California on Behalf of Iran**

62.   Defendants wired thousands of U.S. dollars into the Central District of California on behalf of Iran.  For example:

a.   In an email dated January 11, 2016, an employee of IRAN HOLDING COMPANY 1 emailed ZANGAKANI to ask him to transfer $66,766 to a Santa Monica, California-based company.  The purpose of the transfer was for "Purchasing Electronic Equipment."

b.   On January 14, 2016, EXPROM sent $66,756 to the Santa Monica-based company with an account held at Wells Fargo Bank.  The reference information on the wire transfer details stated, "import of electronic equipment."

---

[18] The contract specified the following payment terms:  1st Payment - $146,500 (10%), 2nd Payment - $660,000 (45%), 3rd Payment - $570,000 (39%), 4th Payment - $88,500 (6%)

**N.   The Defendants Execute $5,782,396 in U.S. Dollar Transactions through another Front Company**

63.   On February 20, 2016, ZANGAKANI sent himself an email titled "company list." The email included an attachment which appeared to be a "LIST OF ALL COMPANIES." The spreadsheet listed multiple company names and included line item costs associated with companies. The line items were local partner, legal, rent, and owner. The second sheet of the document included a list of companies with a ROSCO employee listed next to the names of the companies.

64.   Included on the list was CASTLE HILL INTERNATIONAL TRADING LLC ("CASTLE HILL").

65.   On October 25, 2011, AMIN emailed ZANGAKANI and requested "transfer equivalent of AED 90 min [sic]." AMIN provided a document in Farsi on letterhead for "P.I.T. Corporation PITCO" and stamped by SPEC. The document requested the transfer of 90,000,000 AED Dirhams to IODC at CIMB Bank, account number 14081282572528.

66.   The following transactions were sent from CASTLE HILL at its account at Emirates NBD Bank to IODC purportedly for the purpose, "BUY ENGINEERING SERVICES":

　　　　　a.   October 31, 2011 - $782,500 USD

　　　　　b.   November 2, 2011 - $2,150,000 USD

　　　　　c.   November 3, 2011 - $1,525,000 USD

　　　　　d.   November 8, 2011 - $1,324,896 USD

67.   On January 17, 2012, ZANGAKANI received an email from a representative of Emirates NBD Bank which indicated an attempted payment on December 12, 2011, for $285,100 was considered "null and void" by Deutsche Bank, New York, due to "IRAN PROGRAM."

**MONEY LAUNDERING VIOLATIONS**

68.   18 U.S.C. § 1956(h) criminalizes conspiring to violate the provisions of 18 U.S.C. § 1956.

69.   18 U.S.C. § 1956(a)(1)(A-B) criminalizes conducting a financial transaction involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity or to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

70.   18 U.S.C. § 1956(a)(2)(A) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States, or from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

71.   Pursuant to 18 U.S.C. § 1956(c)(7), the term "specified unlawful activity," includes violations of 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank fraud).

72.   As noted above, section 560.203 of the ITSR states that "any transaction on or after the effective date [meaning 1979] that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in [the ISTR] is prohibited," and that "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part is prohibited."

a.    This constitutes wire fraud, as the false transactions occur via wire, and are done in part to defraud the U.S. Treasury department, which has forbidden such transactions.

b.    This also constitutes wire fraud and bank fraud, as the false transactions occur via wire, and are done in part to defraud U.S. financial institutions, which are barred from conducting such transactions, and could face civil and criminal penalties for not detecting these transactions.

c.    But for such schemes to defraud U.S. correspondent banks, Iranian financial institutions would not be able to engage in U.S. dollar transactions.

73.   Pursuant to 18 U.S.C. § 1956(c)(7), the term "specified unlawful activity," includes violations of IEEPA (including violations of any license, order, regulation, or prohibition issued under IEEPA) and the ITSR.

74.   Pursuant to 18 U.S.C. § 1956(b), whoever conducts or attempts to conduct a transaction described in §§ 1956 (a)(1) or (a)(3), or a transportation, transmission, or transfer described in § 1956(a)(2), is liable to the United States for a civil penalty of not more than the greater of the value of the property, funds, or monetary instruments involved in the transaction or $10,000.

//

//

**COUNT ONE – MONEY LAUNDERING MONETARY PENALTIES**

(Against All Defendants; 18 U.S.C. § 1956(b))

75.   The United States incorporates by reference the allegations set forth in Paragraphs 1 to 74 above as if fully set forth herein.

76.   Defendants transmitted and transferred at least $157,333,367 through the ROSCO ENTITIES and other companies described above which promoted IEEPA-violative transactions.

77.   Defendants transmitted and transferred at least $157,333,367 involving prohibited correspondent banking transactions, which promoted and concealed violations of 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud).

78.   Defendants acted individually and together to transmit and transfer funds to a place inside the United States from or through a place outside the United States, and to a place outside the United States from or through a place inside the United States, with the intent to promote the carrying on of violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), in violation of 18 U.S.C. § 1956(a)(2)(A)).

79.   Defendants acted individually and together to transmit and transfer funds involving the proceeds of violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), in violation of 18 U.S.C. § 1956(a)(2)(A)) with the intent to promote the carrying on of the same, and to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), in violation of 18 U.S.C. § 1956(a)(2)(A)).

1       80.   Defendants and others, known and unknown, conspired

2   together to commit violations of 18 U.S.C. §§ 1956(a)(2)(A), in

3   violation of 18 U.S.C. § 1956(h).

4       81.   Accordingly, the Court should impose monetary penalties

5   against the Defendants for the value of the funds and monetary

6   instruments involved in the transactions, in an amount to be

7   determined at trial.

8                           **CONCLUSION**

9       WHEREFORE, plaintiff United States of America prays that a

10  monetary penalty be entered against the Defendants in favor of the

11  United States, on a joint and several basis, in the amount of the

12  funds and monetary instruments involved in the transactions described

13  above to be determined at trial; and for such other and further

14  relief as this Court may deem just and proper, together with the

15  costs and disbursements of this action.

16

17  Dated: March 19, 2021          TRACY L. WILKISON
                                Acting United States Attorney

18                              CHRISTOPHER D. GRIGG
                                Assistant United States Attorney

19                              Chief, National Security Division
                                STEVEN R. WELK

20                              Assistant United States Attorney
                                Chief, Asset Forfeiture Section

21                              WILLIAM M. ROLLINS
                                Assistant United States Attorney

22                              Terrorism and Export Crimes Section

23                                /s/ Dan G. Boyle

24                              DAN G. BOYLE
                                Assistant United States Attorney

25                              Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

26

27

28